IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72753-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | ORDER DENYING MOTION |
| v. | ) | FOR RECONSIDERATION |
| | ) | AND WITHDRAWING AND |
| MOHAMED IBRAHIM, | ) | SUBSTITUTING OPINION |
| | ) | |
| Appellant. | ) | |

Appellant Mohamed Ibrahim filed a motion to reconsider the opinion filed on January 30, 2017. Respondent State of Washington filed an answer to the motion. The panel has determined that the motion should be denied, but the opinion filed on January 30, 2017 shall be withdrawn and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that appellant's motion for reconsideration is denied and the opinion filed on January 30, 2017 shall be withdrawn and a substitute opinion shall be filed.

DATED this 21st day of ___August___, 2017.

_____

_____
COX, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

STATE OF WASHINGTON,        )     No. 72753-2-I
                                         )
              Respondent,   )
                                         )
         v.                     )     UNPUBLISHED OPINION
                                       )
MOHAMED IBRAHIM,           )
                                       )
             Appellant.     )     FILED: August 21, 2017

SCHINDLER, J. — A jury convicted Mohamed Ibrahim of three counts of assault in the first degree while armed with a firearm and unlawful possession of a firearm in the first degree. Ibrahim contends he is entitled to dismissal with prejudice because the court erred in declaring a mistrial and the retrial violated double jeopardy. In the alternative, Ibrahim seeks reversal on the grounds that (1) the court abused its discretion by allowing the State to amend the information to add a third count of assault in the first degree, (2) the amended information did not inform him of the essential elements of the crime, (3) the court erred in denying the defense request for a material witness warrant, and (4) insufficient evidence supports one of the convictions for assault in the first degree. Ibrahim also claims the court erred by sentencing him to serve the sentence for the three assault convictions consecutively under RCW 9.94A.589(1)(b). We affirm the convictions and the judgment and sentence.

May 2013 Shooting

Vincent Williams Jr., his good friend Mardillo "Mardy" Barnes, and Barnes' friend "Ket" spent the evening of May 17, 2013 together. Williams, Barnes, and Ket went to a bar to drink and shoot pool. Afterward, they smoked marijuana and stopped to get food. At approximately 1:00 a.m., they parked on Fremont Avenue North near North 85th Street. Williams and Barnes lived next to each other about a block away from where they parked the car. Before walking home, Williams, Barnes, and Ket stood next to each other "shoulder to shoulder" on the sidewalk talking.

Williams testified that while they were talking, two "light skinned . . . African American . . . guys" walked toward them. The man walking in front, later identified as Yusuf Haise Shire, was short and wearing "dark clothing." The taller man, later identified as Mohamed Ibrahim, was wearing a blue and white striped zip-up sweatshirt, a baseball cap, and dark gloves. Williams recognized the shorter man as someone he had seen one or two times before and knew as "Louie." Williams did not recognize the taller man.

Shire approached Ket and engaged in a brief and friendly conversation. But when Shire and Ibrahim talked to Barnes, Williams said it was "kind of weird." Barnes acted like he "didn't want to have this conversation" and "just wanted to go home." Williams said the two men were "pretty intoxicated," it seemed "like they were going to go home too," and there were "no threats or . . . intimidation."

But after Shire and Ibrahim started walking away, Shire said, " 'I do this.' " Shire pulled out a revolver, "pointed it in the air," fired a shot, and then pointed the gun at Barnes, Williams, and Ket and fired four more shots. Ibrahim then turned around facing

2

Barnes, Williams, and Ket. Ibrahim pulled out a 9mm semiautomatic pistol from his waistband; pointed the gun at Barnes, Williams, and Ket; and fired at least six shots.

Williams, Barnes, and Ket were standing "right next to" each another within an "arm's length" and were "in the line of fire." Williams saw Ket "run across the street and dive behind a car. So he was kind of like out of the way when Mr. Ibrahim began to fire." After "[b]ullets . . . passed [his] head," Williams hid behind a car. As Barnes "began to run across the street," Ibrahim continued shooting and Williams "saw blood." Williams testified:

> I don't know what their intentions were, but I just know that I think that — like from the gist I got from it and from my own mind is that they were aiming for [Barnes]. . . . Like I said, like it's like a trail of bullets following him like where he ran.

Shire and Ibrahim turned and ran away toward a housing complex.

Williams tried to find Barnes. Williams screamed his name while he followed the direction of the blood on the street. Williams heard Barnes groaning "in agony" and found him in a backyard in a "puddle of blood." Barnes was "holding his hand," blood "dripping out his sleeve."

The Barnes family lived in a housing complex located at 8521 Fremont Avenue North. Barnes' father Mardillo Arnold was awakened by a "loud bang" followed by a pause and several more shots. Arnold ran outside and saw Williams down the street. Arnold ran down the street and asked Williams what happened. Williams looked scared and said, " 'They just shot Mardy.' " Arnold "was really scared" and "ran into the middle of the street . . . screaming, 'Mardy, Mardy, Mardy.' " Barnes "came running from behind a house." Arnold, Barnes, Williams, and someone Arnold "vaguely" knew as "Kip" headed back to their house.

3

Meanwhile, Barnes' mother Carolyn Barnes-Arnold looked out the window and saw someone run by wearing a black shirt or "hoodie." The man ran along a walkway that leads into the courtyard of the housing complex. When Barnes-Arnold ran outside, she saw Williams and Barnes' friend, who she knew as "Ket," standing on the front porch looking scared. Williams was screaming that Barnes had been shot. Barnes was bleeding heavily from his hand. Arnold used his belt to make a tourniquet around Barnes' arm and called 911. Williams told Barnes-Arnold that "Louie" was one of the two shooters.

Thomas English lived in the same housing complex at 8549 Fremont Avenue North. English was smoking a cigarette on his patio around 1:00 a.m. when he saw two black men run through the well-lit courtyard toward Fremont Avenue North. One of the men was "pretty short" and the other was taller. Within minutes, English heard 9 or 10 gunshots. The gunshots were "[v]ery quick" and separated by a "real brief hesitation." The gunshots were "very close[,] . . . [n]ot even a block away."

After hearing the gunshots, English saw two black men, "[o]ne was short and one was tall," run through the courtyard. The shorter man ran by first and was wearing a dark hoodie and dark pants. He was "crouching down" and holding a gun in his hand. The taller man was 10 to 15 seconds behind "running clumsily with [his] hands down in his pants." He was wearing a blue and white striped hoodie and baggie pants. English "couldn't tell" if they were the same two men he saw run by earlier. English went to see if anyone needed "assistance" and saw an "African American" man in shock with a hand injury.

4

David Bentler lived near the intersection of North 85th Street and Fremont Avenue North. Bentler heard two series of gunshots that were very close. When Bentler looked out the widow, he saw a white late-1990s-model Toyota Camry parked in a driveway. Less than a minute later, Bentler saw two men get into the car. A "very tall African American male" wearing "dark colored clothing" got into the back seat behind the driver. As soon as the two men got in the Camry, the car "sped off" heading west on North 85th Street. Bentler called 911 at 1:18 a.m. and provided a description of the vehicle.

At 1:24 a.m., Seattle Police Department Officer Collin Carpenter stopped a white 1996 Toyota Camry in the 7700 block of 3rd Avenue Northwest. There were five people in the car—two in the front and three in the back. Officer Carpenter called for backup. The passenger in the back seat behind the driver, later identified as Ibrahim, did not put his hands up as directed and kept "moving around" and "bending down." The passenger in the back seat of the car on the passenger side, later identified as Shire, was also reaching down.

The police removed the five individuals from the car and conducted a showup identification. Ibrahim is over six feet tall. He was wearing a blue and white striped zip-up sweatshirt and a blue baseball hat. Shire is five feet three inches tall. He was wearing a black T-shirt and jeans. English identified Ibrahim and Shire with "100 percent" certainty as the two men he saw run through the courtyard of the housing complex. Bentler identified the white 1996 Toyota Camry as the car he saw parked in a driveway near the intersection of North 85th Street and Fremont Avenue North.

5

The police found a 9mm semiautomatic pistol under the driver's seat directly in front of where Ibrahim was sitting. The gun has a 16-cartridge capacity. Only 1 bullet remained in the gun. The police found a black and white glove on the floorboard near where Ibrahim was sitting. The police found a .38 caliber revolver under the front passenger seat directly in front of where Shire was sitting. The .38 caliber revolver has a 5-round capacity. The revolver contained 3 unfired rounds and 1 spent shell casing.

Detective Robert Sevaaetasi searched the area where the shooting occurred. Detective Sevaaetasi recovered six 9mm shell casings and a "deformed bullet fragment." Detective Sevaaetasi found bullet "strike marks in the planting strip" near the street.

Detective Thomas Janes interviewed Williams the next day. Detective Janes prepared two six-person photomontages, one with a photo of Shire and the other with a photo of Ibrahim. Williams identified Ibrahim and Shire as the shooters with "100 percent" certainty.

Williams told the police he knew the third victim only as "Barkett" and did not know where to find him. Barnes refused to provide any information to the police. Barnes' father told the police he did not know "Barkett." The police believed the man identified as "Barkett" was associated with the "Barquet" family. The police were unable to identify or locate the person identified as "Ket," "Kip," or "Barkett."

Testing performed by the Washington State Patrol Crime Laboratory (WSPCL) showed the six 9mm shell casings found at the location of the shooting were fired from the 9mm semiautomatic gun the police found on the floor of the Toyota under the driver's seat directly in front of where Ibrahim was sitting. Fingerprint analysis showed

6

the fingerprints on the cylinder of the .38 caliber revolver the police found under the front passenger seat directly in front of where Shire was sitting matched Shire's left thumb and left middle finger.

On May 21, 2013, the State charged Ibrahim and Shire with assault of Barnes in the first degree while armed with a firearm, assault of Williams in the first degree while armed with a firearm, and unlawful possession of a firearm in the first degree.

The trial was scheduled to begin on September 16, 2013. At the request of Ibrahim, the trial was continued for six weeks until October 28, 2013. Ibrahim's attorney requested the six-week continuance because his new counsel needed "time to prepare." Between October 28 and November 18, the court continued the trial each day because the prosecutor was in trial.[1] Beginning November 20, the court continued the trial because of "[n]o judicial availability."

November 26, 2013 Trial

The trial began on November 26, 2013. The State listed " 'Kip' Barquet" as a witness. The State estimated the trial would "last approximately 10 days including jury selection."

Before jury selection on December 2, the court confirmed when the parties anticipated submitting the case to the jury. The prosecutor told the court the State planned to give closing argument on December 16 and submit the case to the jury on December 17 "[a]t the very latest."

> Your Honor, I'm beginning my holiday leave on the 18th so I have every intention of getting this case to the jury on the 17th.
> THE COURT: At the very latest.
> [PROSECUTOR]: At the very latest. I think more likely we will be able to, I think perhaps, do closings Monday the 16th. But I would say that

---

[1] On November 19, the court continued the trial one day for medical leave.

the State will be making every effort to get the case to the jury on the 17th.
No later than the 17th.

Shire's attorney told the court that December 16 was a "reasonable time to do closings" because Shire did not "have any witnesses to offer" and would rest after the State completed its case in chief. Ibrahim's attorney agreed and was "optimistic" that the parties would give closing arguments on December 16.

The jury was empaneled on December 3. Between December 4 and December 16, the State called a number of witnesses to testify, including Williams, Barnes, Arnold, Barnes-Arnold, English, Bentler, Detective Janes, Detective Sevaaetasi, WSPCL firearm examiner Kathy Geil, and Seattle Police Department latent fingerprint examiner Kellie Anderson.

Williams identified Ibrahim and Shire as the shooters. Williams testified that Shire fired a shot "in the air" from a "snubbed nosed" revolver and then pointed the gun "directly at us" and "started firing towards us." Williams said he was standing with Barnes and Ket on "the same sidewalk square" when Shire began shooting. Williams testified that Ibrahim then pulled a 9mm semiautomatic pistol from his waistband and "began to shoot." During the shooting, Williams "felt like [heat] passed my face, like bullets." Williams said Ibrahim initially fired "[t]owards us" and then began to fire "[t]owards the middle of the street" when Barnes ran across the street. Williams testified that as Shire and Ibrahim ran away toward North 85th Street, they "cut through" the nearby housing complex.

Barnes testified that he "kn[e]w a guy named Barket or Kip or Kit." Barnes testified he called him "Ket" but he had "no idea what's his real name." Barnes said he is "one of the homies that come around sometimes." Barnes testified he was eating and

"minding my own business" when shots were fired and "I got hit." Barnes said he did not remember seeing anyone in the street before the shooting. Barnes testified he did not see who shot him or "where these bullets were coming from."

On Wednesday, December 11, the prosecutor told the court the State planned to conclude its case on Monday, December 16. Shire's attorney stated, "At this point, I don't have any witnesses" to call. Ibrahim's attorney told the court he had no witnesses to call, "[t]he same" as Shire. The court told the jury that deliberations would likely begin on Monday, December 16.

> We still plan on getting the case to you for deliberations on Monday, which is the representation I think we made at the outset . . . . [O]ur prediction is that we're going to finish everything up in the morning, hopefully, and get the case to you for deliberations on Monday like we planned.

At the end of the day, the court reiterated that jury deliberations would begin "sometime[ ]" on December 16.

On Monday, December 16, the prosecutor told the court the State planned to conclude the presentation of evidence that day. At the end of the day, the court told the jury the trial was "a little bit behind schedule, but not too much," and the State would call its final witness and the parties would give closing arguments the next day on December 17.

While reviewing the proposed jury instructions the next morning, Shire's attorney told the court and the prosecutor that the defense had located and interviewed the "missing witness, Berkett Kebede." Shire's attorney said that on Tuesday, December 10, Kebede approached him outside the courtroom. The attorney spoke briefly with Kebede to determine "if he was who [he] said he was and if he had any information related to the case." During the next five days, the attorney investigated Kebede and

9

his potential testimony and discussed whether to call Kebede as a witness with his colleagues and Shire.

The attorney told the court Kebede "would testify that he knows all the parties in the case, that he was present at the shooting, that he did see the shooters and that the shooters are not Mr. Shire or Mr. Ibrahim." Shire's attorney said he served Kebede with a subpoena on Monday, December 16, and Kebede was present in the hallway outside the courtroom.

The court took a recess to allow the State to interview Kebede. With the attorneys present, Seattle Police Department Gang Unit detectives interviewed Kebede for more than an hour. Kebede said he had been in contact with Shire and Ibrahim after they were arrested. Kebede told the detectives he attended the trial when Williams testified on December 5 and he contacted Shire's attorney "the past week." Kebede gave the detectives the telephone number he used to talk to Shire and Ibrahim while they were in jail.

The State moved to exclude Kebede's testimony "given the willful nondisclosure and the other issues with this particular witness' testimony." The State argued the interview established Shire and Ibrahim "were well aware of how to get ahold of [Kebede] and if they wanted him called as a witness they could have disclosed him in a timely manner." The State also pointed out the need to conduct further investigation to "effectively cross-examine" Kebede.

> [T]his particular witness has been in contact with the defendants, both of them since their arrest apparently via jail calls. . . . He also admits to several jail visits with Mr. Shire and receiving letters from Mr. Shire as well. Obviously, those are all things that the State needs to investigate and look into in order to effectively cross-examine this particular witness. The witness — other issues include like I had mentioned the witness has

watched part of trial and has indicated that since the 4th or the 5th when he was here for trial the first time, has been in fairly constant contact with the defendant's sister . . . . [S]he has been keeping him abreast of what has been occurring during the trial. So we have some extreme taint issues with this witness as well. Additionally, the State believes we have some 5th amendment issues with this particular witness and he may in fact need to have an attorney present.

The court denied the motion to exclude Kebede from testifying because of the exculpatory nature of the testimony. Specifically, that according to the offer of proof, Shire and Ibrahim "had nothing to do with the shooting." "In this case, it's really clear to me that nobody else is going to be offering th[is] evidence."

The State then requested a "lengthy recess" to conduct "additional investigation based on just what this witness has admitted to."

I think [a lengthy recess] is the next solution in this particular case, Your Honor. I mean, given what this witness has to say, given the time of the disclosure by defense, and given the additional investigation based on just what this witness has admitted to as far as contact with the defendants in this case. We've already ordered the most recent set of jail calls since the trial began, but obviously, you know, those take time to listen to and investigate.

The court asked Shire's attorney, "[W]hat's your thought on the recess until January 14th?" Shire's attorney stated he was "left in a position to object." The attorney argued there was "no reason we can't [get] through the witnesses and close this case tomorrow." Ibrahim's attorney agreed a lengthy recess is "a problem. . . . So yes, I would object." Ibrahim's attorney also agreed there was "no reason we couldn't conclude this case tomorrow or if we have to the next day." The prosecutor told the court she was available for the next couple of days but argued the State would need more than a day or two to prepare to cross-examine Kebede.

The court rejected a short recess. The court concluded a short recess was not a viable option because the State needed "significant" time to investigate and prepare for cross-examination.

> I think the State is going to need more time than an afternoon to investigate what they're going to need to investigate given the substance of those purported testimony. It's going to be significant.

The court concluded the only option was to recess the trial until January 14 but expressed concerns about doing so.

> So then the only issue I have right now is whether or not I'm going to continue the matter or recess the matter until January 14th, which would require me posing to the jury: Are you willing to come back in January to finish this up for however long it takes? It might be a couple days. It might be a week. We made representations to this jury about how long their serve [sic] was going to be and we've already thrown that out the window, and, frankly, I'm disinclined to ask[ ] them that question.

The court noted it "hate[ed] the thought of granting a mistrial particularly when we put so much into this already" but could not exclude testimony that "purportedly goes right to the heart of the matter."

After a recess, the prosecutor asked the court to poll the jury to determine if jurors would be able to return in January. The court rejected the request to poll the jury about a continuance to January 14.

> I'm not going to poll the jury on this. I just don't feel comfortable doing that. We're talking about an almost month long recess. I can't imagine that they've all taken enough notes during the trial that they can adequately refresh their recollection on all the nuances of the testimony they've heard in this case. . . . Affirmative representations, as I said before, were made to them at the outset of this trial. We told them they'd be in deliberations yesterday. Right now we are nowhere close to getting them into deliberations.

The court also concluded continuing the trial would prejudice the defense.

> [I]t looks a little coercive from my prospective, and . . . don't you think they're going to be wondering what all necessitated this three-week hiatus. And none of us are in a position to be able to explain anything to them at this juncture, and once we get back on the record, if we ever did with this jury, I have a feeling they'd be going, "Oh, I see what happened. It's that defense. Oh, I got it."

Shire's attorney agreed with the court. "[M]y concern with keeping that jury is that they're going to infer the reason for delay and that it will reflect negatively on Mr. Shire regardless of an instruction."

Over the objection of the parties, the court declared a mistrial. The court ruled the "late disclosed" exculpatory defense witness created a "manifest necessity" for a mistrial.

> I'm going to hold to the mistrial, and I don't think jeopardy attaches because in essence it was a late disclosed defense witness that necessitated the mistrial, and I will find manifest necessity for all the reasons I've said already.

## Motion to Dismiss Charges as Barred by Double Jeopardy

The second trial was assigned to another judge and scheduled to begin in January 2014. Before trial, Ibrahim and Shire filed a motion to dismiss with prejudice. Ibrahim and Shire argued the court abused its discretion by sua sponte declaring a mistrial and double jeopardy barred retrial of the charges. Ibrahim and Shire argued the court "never realistically considered workable options available other than mistrial." For the first time, Ibrahim and Shire argued the court did not consider the option of ordering the prosecutor or co-counsel to complete the trial.

The State argued the record supported finding manifest necessity and the court did not abuse its discretion in declaring a mistrial. In support, the State filed the

13

transcript from the interview the detectives conducted with Kebede on December 17, 2013; a transcript of the court hearing on December 17, 2013; and the declaration of Senior Deputy Prosecuting Attorney (DPA) Julie Kline.

Senior DPA Kline described the lengthy investigation after learning the identity of Kebede, including the need to examine approximately 220 jail phone calls.

> . . . . Prior to December 16, 2013, the State had no knowledge of the identity of the person described by witnesses as "Kip" or "Barquet". This included any knowledge of his address, phone number, physical appearance or true and correct name.
> . . . . The State and Seattle Police made efforts to identify "Kip" because according to witnesses, the State believed he would not only be able to confirm the identity of the shooters, but was also a victim and his identification would allow for the addition of another count of Assault.
> . . . . Upon learning the identity and telephone number of "Kip" on December 16, 2013 (true and correct name: Berket Kebede), the State examined the 220+ jail phone calls of both defendants using the telephone number Mr. Kebede provided. Without having Mr. Kebede's telephone number, there was no way to determine the identity of the persons the defendants were calling from Jail. Upon examination, it was discovered that there were multiple calls from the defendants, who remained jailed during the pendency of this case, to Mr. Kebede's telephone number. The first call from defendant Shire to Mr. Kebede was dated May 31, 2013. The first call from defendant Ibrahim to Mr. Kebede was dated June 8, 2013. Parts of these conversations were not in English.
> . . . . The calls between the defendants and Mr. Kebede frequently made mention of Mr. Kebede coming during jail visitation hours and bringing writing implements to take notes at the instruction of defendant Shire.

Senior DPA Kline also described the need to call rebuttal witnesses.

> . . . . Mr. Kebede indicated in his defense interview that he was present in court for Vincent Williams' testimony in trial, which occurred December 5, 2013. Both defendants are acquainted with Mr. Kebede, were present in trial on December 5, 2013, and would have been aware of his presence in court.
> . . . . During his defense interview, Mr. Kebede claimed that he did not name the defendants as the shooters after the incident to the victims or the victims' family members after the incident. This is

14

> contrary to what these witnesses have stated and rebuttal testimony by these witnesses would have been necessary subsequent to Mr. Kebede's testimony at trial.

Senior DPA Kline states requiring co-counsel to try the case was not a viable option.

> I invited Deputy Prosecuting Attorney Paul Sewell to co-try this case with me in order to gain felony trial experience. At the time this trial began, he had only previously tried one felony jury trial. Mr. Sewell would not have been otherwise assigned this case given the seriousness level and complexity without supervision from a senior deputy prosecutor, such as myself.

In response to the court's questions about the efforts to locate Kebede, DPA Sewell said Barnes' parents knew Kebede only as a friend of Barnes from the neighborhood named "Ket."

> [Barnes' parents] had indicated that [Kebede] was a friend of their son[']s kind of from the area they're aware of. They only knew him as Ket. That was all the information that we had, which is clearly short for his first name. To be perfectly honest the State was under the impression that he was a member of the [Barquet] family, which are fairly well-known by the Seattle Police Department and so that was the avenue that we were going by. I personally was scouring records looking for someone in the family that was either in that area or the same age. So that, of course, ended fruitless because he wasn't a member of that family. It was only when he came forth that we found out — during the trial we found out — his real identity and his real name. As I said, the family members only knew of him as Ket. That's all the information that we received.

The court denied the motion to dismiss the charges as barred by double jeopardy.[2] The court concluded the options "on December 17th where suddenly this witness with potentially exculpatory information" was disclosed were "very limited at that point." The court ruled it was not an abuse of discretion to deny the request to exclude the witness.

---

[2] Ibrahim does not assign error to this ruling.

15

The court concluded the parties had "ample opportunity . . . to state their positions."

> The record does indicate that the Court gave ample opportunity to the — to counsel to flush out their positions in order that the Court could give consideration to the various options before it. The Court's determination ultimately is entitled to a significant degree of deference and respect in light of the absence of misconduct and the opportunity for all parties to state their positions.

The court ruled a short continuance "would not have been adequate to fairly allow for the evidence to be properly presented in fairness to all parties in the case."

> Certainly, the State would need at least a week as well to find who this individual is, to get transcripts of any defense interviews, to interview him, to listen to all the relevant phone calls, to conduct any other background investigation that was necessary and to arrange for any potential rebuttal testimony that might be required as result of the witness.

The court also concluded it was not an abuse of discretion to reject a month-long continuance.

> The judge was sensitive to the fact that this was potential exculpatory evidence whether it's believed or not, would be a question for the jury. But the jury should be able to have full information before in making that determination. So the judge concluded and within the range of discretion vested in the trial judge that there was a manifest necessity to declare a mistrial to go back to square one and start the trial over somewhere down the road.
> 
> I do not think it is fair to jurors nor is it a good practical solution to have a month-long recess in the middle of the trial. Particularly, one such as this where the testimony has been confusing and hotly debated, difficult credibility decisions had to be made as to a number of the witnesses who had been presented to that jury. To recess the case then from mid-December to mid-January really was not a viable option. As a practical matter, I don't think — I don't think that the jurors would be able to accomplish that mental feet [sic] to keep their minds free and clear and to be able to fully and fairly process the information after taking a month off at the busy holiday season of the year.
> 
> In addition, I do think judges are sensitive to what is fair and unfair with respect to the jurors as well as fair and unfair with respect to the parties. It would be an incredible burden to place upon the jurors to put them in that position. So I don't fault the judge for not making the inquiry

16

of the jurors as to whether or not they would indicate their willingness to make a good-faith attempt to take a nearly month long recess at the holiday season in the middle of the trial and then come back and try to resume their duties. So, again the stakes are high obviously because it's a motion to dismiss these charges. The Court is going to deny that motion to dismiss and allow the case to proceed at this point.

## September 3, 2014 Trial

The second trial began on September 3, 2014. The court granted the State's motion to file an amended information to add assault of Kebede in the first degree.[3]

The State called a number of witnesses, including Williams, Barnes, Arnold, Barnes-Arnold, English, Bentler, forensic experts, and detectives. In addition, the State called the surgeon who operated on Barnes' hand.

Detective Janes testified about his unsuccessful efforts to locate Berket Kebede. Detective Janes read into evidence the letter that Shire had written about the need to make sure "none of the victims or the witness" testify.

> What's up, Samira? How's everything. Tell Lucky I said I love her and to do good in school; that I miss her. But yeah, man, my case is looking kind of bad right now that they pushed it back 'til October. And they got my prints on the gun. But really, my case relies on the victims. If the victims don't come, I will get charged with the gun. That's why I'm stressing really! So far they can't get a hold of none of the victims or the witness.
> But yeah, I need you give to take Oh Boy out of town to Cali and give him like one thousand a month to live until my shit is over with 'cause if they find him and he comes, I'm cooked. Bad. That's why I need you to do that, because with him I shouldn't — should be good. 'Cause they are — are looking for him.
> But yeah, this is my cut-up number, (206)844-5764. Call him and he will let you know how to handle everything. I need this alone ASAP. And call (206)403-6612 and give her the letter and poem please. And I sent a letter awhile back to the house and Hooda had it and didn't give it to her. So it's — it's pretty in her room. I need you — need you to give her that too please.
> Samira, don't forget. Try to do it as soon as possible. Much love.

---

[3] The State filed a subsequent amended information to correct the spelling of Kebede's name.

The jury found Shire guilty of three counts of the lesser included crime of assault in the second degree while armed with a firearm and unlawful possession of a firearm in the first degree. The jury found Ibrahim guilty of three counts of assault in the first degree while armed with a firearm and unlawful possession of a firearm in the first degree. Ibrahim appeals.

## Double Jeopardy

Ibrahim contends the court erred in declaring a mistrial and double jeopardy barred retrial on the charges against him.

The Fifth Amendment to the United States Constitution and the Washington State Constitution prohibit the State from twice putting a defendant in jeopardy for the same offense. U.S. CONST. amend. V ("No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."); WASH. CONST. art. I, § 9 ("No person shall be . . . twice put in jeopardy for the same offense."); State v. Fuller, 185 Wn.2d 30, 33, 367 P.3d 1057 (2016). Because Washington's double jeopardy clause is coextensive with the federal double jeopardy clause, it is given the same interpretation the Supreme Court gives to the Fifth Amendment. State v. Eggleston, 164 Wn.2d 61, 70, 187 P.3d 233 (2008); State v. Glasmann, 183 Wn.2d 117, 121, 349 P.3d 829 (2015).

Jeopardy attaches when a jury has been impaneled and embraces the defendant's right to have the trial " 'completed by a particular tribunal.' " Crist v. Bretz, 437 U.S. 28, 35-36, 98 S. Ct. 2156, 57 L. Ed. 2d 24 (1978) (quoting Wade v. Hunter, 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 (1949)); Downum v. United States, 372 U.S. 734, 735-36, 83 S. Ct. 1033, 10 L. Ed. 2d 100 (1963); Arizona v. Washington, 434

18

U.S. 497, 503, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978). If the jury is discharged without reaching a verdict, double jeopardy bars a retrial unless manifest necessity exists to declare a mistrial. Green v. United States, 355 U.S. 184, 188, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957); Wade, 336 U.S. at 688-89; Washington, 434 U.S. at 505.

Whether retrial violates double jeopardy is a question of law we review de novo. Fuller, 185 Wn.2d at 34; State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). Where manifest necessity to declare a mistrial exists, the prohibition against double jeopardy is not implicated and retrial is permitted. Oregon v. Kennedy, 456 U.S. 667, 672, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982); State v. Wright, 165 Wn.2d 783, 793, 203 P.3d 1027 (2009).

"Necessity" is not interpreted literally. Washington, 434 U.S. at 506; Renico v. Lett, 559 U.S. 766, 774, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010). Manifest necessity exists where " 'extraordinary and striking circumstances' " indicate to a court in the reasonable exercise of its discretion that the " 'ends of substantial justice cannot be obtained without discontinuing the trial.' " State v. Jones, 97 Wn.2d 159, 163, 641 P.2d 708 (1982) (quoting State v. Bishop, 6 Wn. App. 146, 150, 491 P.2d 1359 (1971)); Renico, 559 U.S. at 783-84. The determination of whether "manifest necessity" exists to justify ordering a mistrial over the objection of the defense is a matter within the discretion of the trial court to be exercised according to the particular circumstances of each case. United States v. Perez, 22 U.S. 579, 580, 9 Wheat. 579, 6 L. Ed. 165 (1824).

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would

otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.

Perez, 22 U.S. at 580.[4]

Ibrahim argues "manifest necessity" did not exist to order a mistrial. The State contends the court did not abuse its discretion in finding manifest necessity and declaring a mistrial. We review the decision to declare a mistrial under an abuse of discretion standard and "give '[g]reat deference' to the trial court's decision to declare a mistrial." State v. Strine, 176 Wn.2d 742, 753, 293 P.3d 1177 (2013)[5] (quoting Jones, 97 Wn.2d at 163); State v. Greiff, 141 Wn.2d 910, 921, 10 P.3d 390 (2000); Washington, 434 U.S. at 510. The trial judge has " 'broad discretion' " to determine whether manifest necessity for a mistrial exists and the trial court is best situated to decide whether, for compelling reasons, "the ends of substantial justice cannot be attained without discontinuing the trial." Renico, 559 U.S. at 774 (quoting Illinois v. Somerville, 410 U.S. 458, 462, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973)); Wade, 336 U.S. at 689-90; Strine, 176 Wn.2d at 754; State v. Brunn, 22 Wn.2d 120, 145, 154 P.2d 826 (1945); Gori v. United States, 367 U.S. 364, 368, 81 S. Ct. 1523, 6 L. Ed. 2d 901 (1961). Further, "the overriding interest in the evenhanded administration of justice" requires that we accord "the highest degree of respect" to the trial court's evaluation that a mistrial was necessary. Washington, 434 U.S. at 511.

The interest in orderly, impartial procedure would be impaired if [the trial court] were deterred from exercising that power by a concern that any time a reviewing court disagreed with [the court's] assessment of the trial situation a retrial would automatically be barred.

Washington, 434 U.S. at 513.

---

[4] Emphasis added.
[5] Alteration in original.

There is no "mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." Somerville, 410 U.S. at 462; Washington, 434 U.S. at 506. Although the United States Supreme Court has avoided establishing clear-cut guidelines on what constitutes manifest necessity, the Court has considered (1) whether the trial court "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial," Washington, 434 U.S. at 515-16; (2) whether the trial court considered alternatives to a mistrial, United States v. Jorn, 400 U.S. 470, 487, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971); (3) whether the trial court acted deliberately rather than "precipitately," Washington, 434 U.S. at 515; and (4) whether the mistrial would be to the benefit of the defendant or the prosecution, Gori, 367 U.S. at 369. See also State v. Melton, 97 Wn. App. 327, 332, 983 P.2d 699 (1999) (identifying the following three factors to consider: (1) whether the court gave both parties the opportunity to explain their positions, (2) whether the court considered the defendant's interest in having the trial concluded in a single proceeding, and (3) whether the court considered alternatives to declaring a mistrial).

Ibrahim does not dispute that the trial court gave all parties the opportunity to fully explain their positions on the propriety of a mistrial or that the trial court acted deliberately in declaring a mistrial. Ibrahim asserts the court did not consider reasonable alternatives before declaring a mistrial and the mistrial was prejudicial to the defense. The record does not support his argument.

The record shows the court considered and rejected several alternatives before declaring a mistrial. The court first considered excluding the testimony of Kebede but

21

rejected this alternative because of the critical nature of the exculpatory testimony. The court considered the defense request for a brief recess but concluded this alternative was not feasible given the "significant amount of background investigation" the State needed in order to cross-examine Kebede. The court considered but rejected the request to poll the jury to determine whether the jurors would be able to return to complete the trial the next month. Because of the representations made to the jury at the beginning and throughout the trial, the court concluded a lengthy recess would prejudice the defense and declined to poll the jury about returning in mid-January to complete the trial.[6]

Ibrahim argues the court should have considered several other alternatives, including whether another prosecutor could have completed the trial or whether the prosecutor could have returned from a scheduled vacation after completing the investigation of Kebede. These alternatives were never suggested by the defense before the court declared a mistrial. Strine, 176 Wn.2d at 749 (appellate court will not consider claim of error not raised in the trial court); State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009) (a party may not raise an objection not properly preserved).

Unlike in State v. Robinson, 146 Wn. App. 471, 483-84, 191 P.3d 906 (2008), the record shows the court considered a number of alternatives to a mistrial. Further, a court need not exhaustively consider "every conceivable alternative" before finding

---

[6] We note representations made to the jury about the length of the trial are valid concerns for the court to consider in declaring a mistrial. See United States v. Lynch, 598 F.2d 132, 135 (D.C. Cir. 1978) (where "jury had been selected on the basis of a reasonable expectation of discharge by December, mid-December at the latest," the distraction posed by "the impending holidays" was "supportive of a declaration of a mistrial based on manifest necessity"); Powers v. United States, 412 A.2d 1205, 1207 (D.C. Cir. 1980) ("extension of the jurors' service beyond their scheduled 'last day' " and proximity to Christmas supported decision to declare a mistrial).

manifest necessity for a mistrial. Ross v. Petro, 515 F.3d 653, 668-69 (6th Cir. 2008); see Washington, 434 U.S. at 506.

Ibrahim also argues the State created the time constraints that led to the need to declare the mistrial. Ibrahim cites the continuances from October 28 until November 26, 2013. The record shows that from October 28 until November 18, 2013, the court continued the trial a number of times because the prosecutor was in trial on another case. From November 20 to November 25, the court continued the trial because of judicial unavailability. Setting aside the legitimate need to continue the trial on a day-to-day basis from October 28 to November 26, Ibrahim ignores his request for a lengthy six-week continuance from the originally scheduled trial date to October 28 and the disclosure of Kebede on the last day of trial.

In support of his argument that the mistrial resulted in prejudice, Ibrahim points to differences in the testimony of Williams and the testimony of Dr. Nicholas Vedder in the second trial. The differences Ibrahim relies on do not support his argument of prejudice. At the first trial, Williams testified that when Ibrahim pulled out his gun, he initially fired "[t]owards our way" and then began to fire "across the street" where Barnes and "Ket" were running. On cross-examination, Williams acknowledged that because both Barnes and "Ket" ran across the street, he could not say Ibrahim was aiming specifically for Barnes. In the second trial, Williams testified that it seemed liked Shire and Ibrahim were aiming for Barnes because as Barnes ran across the street, there was a "trail of bullets following him like where he ran." Dr. Vedder did not testify at the first trial. But his testimony at the second trial was cumulative of the testimony about Barnes' hand injury at the first trial.

We conclude the court did not abuse its discretion in finding manifest necessity for a mistrial and the second trial did not violate double jeopardy. The record shows the court gave all parties the opportunity to explain fully their position on the propriety of a mistrial, considered a number of alternatives to a mistrial, acted deliberately, and declared the mistrial on the last day of trial to allow the defense to present the exculpatory testimony of a late-disclosed witness. Washington, 434 U.S. at 505; Kennedy, 456 U.S. at 672; Wright, 165 Wn.2d at 793.

## Amended Information

Ibrahim argues the court abused its discretion in allowing the State to amend the information before the second trial to add assault of Berket Kebede in the first degree while armed with a deadly weapon.

Ibrahim and Shire agreed they had notice of the "intent to add this count since January 22, 2014." The defense objected to the amendment under CrR 8.3(c). The court rejected the CrR 8.3(c) argument and granted the motion to amend.

For the first time on appeal, Ibrahim argues assault of Kebede in the first degree was a "related offense" that the State should have charged before the first trial. In support, Ibrahim cites a case that addresses CrR 4.3, State v. Russell, 101 Wn.2d 349, 678 P.2d 332 (1984). We decline to review the argument Ibrahim raises for the first time on appeal. Powell, 166 Wn.2d at 82.

## Sufficiency of the Amended Information

Ibrahim argues his constitutional right to notice was violated because the amended information did not inform him of the elements of the crime of assault in the

24

first degree. Specifically, that the amended information did not state he could be found guilty as an accomplice or under the theory of transferred intent.

We review challenges to the sufficiency of a charging document de novo. State v. Goss, 186 Wn.2d 372, 376, 378 P.3d 154 (2016); State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007). A defendant has a constitutional right to be informed of the "nature and cause" of the charges against him. U.S. CONST. amend. VI; WASH. CONST. art I, § 22 (amend. 10); State v. McCarty, 140 Wn.2d 420, 424-25, 998 P.2d 296 (2000). A charging document satisfies these constitutional requirements "if it states all the essential elements of the crime charged." McCarty, 140 Wn.2d at 425; State v. Kjorsvik, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991).

" 'An essential element is one whose specification is necessary to establish the very illegality of the behavior charged.' " Goss, 186 Wn.2d at 378[7] (quoting State v. Zillyette, 178 Wn.2d 153, 158, 307 P.3d 712 (2013)). Because accomplice liability and the theory of transferred intent are not essential elements of the crime of assault in the first degree, the amended information did not violate the constitutional right to notice. See RCW 9A.36.011(1)(a); State v. Elmi, 166 Wn.2d 209, 214-15, 207 P.3d 439 (2009).[8]

## Material Witness Warrant

Ibrahim argues the court violated his constitutional right to compulsory process and to present a defense by denying the request on the last day of the second trial to

---

[7] Internal quotation marks omitted.

[8] The State need not allege accomplice liability or transferred intent. See State v. Carothers, 84 Wn.2d 256, 262, 525 P.2d 731 (1974); State v. Teal, 117 Wn. App. 831, 838, 73 P.3d 402 (2003); State v. Johnston, 85 Wn. App. 549, 555, 933 P.2d 448 (1997); State v. Rodriguez, 78 Wn. App. 769, 771-74, 899 P.2d 871 (1995); State v. Clinton, 25 Wn. App. 400, 403-04, 606 P.2d 1240 (1980); United States v. Montoya, 739 F.2d 1437, 1437-38 (9th Cir. 1984).

issue a material witness warrant for Kebede.[9]

Both the United States Constitution and the Washington State Constitution guarantee an accused the right to compulsory process to compel the attendance of witnesses and the right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22 (amend. 10); State v. Maupin, 128 Wn.2d 918, 924-25, 913 P.2d 808 (1996); State v. Levy, 156 Wn.2d 709, 731, 132 P.3d 1076 (2006). The right to compulsory process is "synonymous" with the right to present a defense. State v. Tracy, 128 Wn. App. 388, 397-98, 115 P.3d 381 (2005). We review a claim of denial of Sixth Amendment rights de novo. State v. Iniguez, 167 Wn.2d 273, 280-81, 217 P.3d 768 (2009).

Neither the right to compulsory process nor the right to present a defense is absolute. State v. Thomas, 150 Wn.2d 821, 857, 83 P.3d 970 (2004); Maupin, 128 Wn.2d at 924-25. Whether denial of the request to issue a material witness warrant "rises to the level of a constitutional violation requires a case-by-case inquiry." State v. Downing, 151 Wn.2d 265, 275-76, 87 P.3d 1169 (2004).

The availability of the right to compulsory process "is dependent entirely on the defendant's initiative." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). "In order for the right to be violated, the 'sovereign's conduct' must impermissibly interfere with the right to mount a defense." State v. McCabe, 161 Wn. App. 781, 787, 251 P.3d 264 (2011) (quoting United States v. Theresius Filippi, 918 F.2d 244, 247 (1st Cir. 1990)). The contested act or omission must be attributable to

---

[9] Ibrahim did not ask the court to issue a material witness warrant for Kebede. But because Shire's attorney requested a material witness warrant, we reject the State's argument that Ibrahim waived his right to argue denial of the motion for a material witness warrant violated his constitutional rights. Under RAP 2.5(a), a party may raise a claim of error on appeal "if another party on the same side of the case has raised the claim of error in the trial court."

the sovereign, and it must cause the loss or erosion of material testimony that is favorable to the accused. McCabe, 161 Wn. App. at 787. There is no violation where "the obstacle to a defendant's getting what he perceives as the full benefit of his Sixth Amendment right is not government interference, but an uncooperative witness." McCabe, 161 Wn. App. at 787.

The right of a defendant to compulsory process is subject to rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. McCabe, 161 Wn. App. at 787; State v. Finch, 137 Wn.2d 792, 825, 975 P.2d 967 (citing Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)), cert. denied, 528 U.S. 922, 120 S. Ct. 285, 145 L. Ed. 2d 239 (1999). We review a trial court's decision to deny a motion for issuance of a material witness warrant for a manifest abuse of discretion. City of Bellevue v. Vigil, 66 Wn. App. 891, 895, 833 P.2d 445 (1992). In exercising its discretion to grant or deny a request for compulsory process, the trial court may consider a number of factors, including "surprise, diligence, materiality and maintenance of orderly procedure." State v. Edwards, 68 Wn.2d 246, 255, 412 P.2d 747 (1966); State v. Schaffer, 70 Wn.2d 124, 129, 422 P.2d 285 (1966); State v. Eller, 84 Wn.2d 90, 95, 524 P.2d 242 (1974).

The record supports the trial court's decision to deny the untimely request to issue a material witness warrant on the last day of trial. The record also shows that issuing the material witness warrant would have resulted in either a significant delay or a continuance to locate Kebede.

The trial began on September 3, 2014. The court granted the State's motion to amend the information to add a charge of assault of Kebede in the first degree. The

State identified Kebede as a witness. On September 4, the State issued a subpoena to Kebede to testify at trial. On September 11, the prosecutor told the court that the State would not call Kebede as a witness. The prosecutor said he was not sure Kebede had been served properly with the subpoena and the police had attempted, but failed, to locate him. Shire's attorney told the court he planned to subpoena Kebede to testify at trial.

On September 16, the State called the final witness in its case in chief. During a recess, the court asked the defense attorneys about the witnesses the defense planned to call. Shire's attorney told the court he had not had any contact with Kebede since December 2013 and believed the likelihood that Kebede would come to court was "slim." But the attorney asked the court to "give defense until tomorrow morning" to locate Kebede. Ibrahim's attorney then disclosed for the first time that Kebede had called her during the noon recess that day and said he would come to court to testify the next morning at 8:30 a.m. The court told the defense that if Kebede did not appear, the case would conclude the next day.

> You know, I'd like to be prepared to go with whatever happens tomorrow. If he arrives and testifies and it takes all day, fine, and our jurors are okay if they don't get closings until Thursday morning, but if he doesn't show and if there's no further testimony I'd like to be able to go right into instructions and argument tomorrow morning.

The next morning, Shire's attorney told the court that he talked to Kebede that morning, that Kebede had received the defense subpoena and "would be here at 9:00" a.m. Shire's attorney told the court that if Kebede did not appear, he would be "obliged to ask" for a material witness warrant.

> [SHIRE'S ATTORNEY]: I think the only other thing that I would have would be a motion for a material witness warrant. Unfortunately, the

28

> service information is as I've described to the Court and that's all I can offer the Court in terms of a basis for that.
>
>    THE COURT: Okay.
>
>    [SHIRE'S ATTORNEY]: But I would be obliged to ask.

The court ruled, "And I think I would in light of the timing be obliged to decline the invitation." Shire's attorney noted, "That's not a surprise." The prosecutor told the court there "actually is a warrant for Mr. Kebede's arrest" in municipal court.

Shire called the investigator to testify. Kebede did not appear. At approximately 9:40 a.m., Shire's attorney requested the court issue a material witness warrant. The court denied the request.

> And the record will reflect, as I suggested a moment ago, that that would be denied based on the timing. This is too much of a Deja vu all over again with the last trial with Mr. Kebede's possible appearance on the last day of a two-week trial.

The court instructed the jury on the law and closing arguments began later that morning.

The court did not err in denying the request to issue a material witness warrant. The record shows the State did not interfere with the right of the defense to compel attendance of Kebede. The obstacle the defense faced was an uncooperative witness. The record also shows issuing a material witness warrant on the last day of trial would have necessitated a lengthy delay or continuance.

United States v. Moudy, 462 F.2d 694 (5th Cir. 1972), and State v. Edwards, 68 Wn.2d 246, 412 P.2d 747 (1966), are distinguishable. In Moudy, the defendant requested a subpoena for a witness the day before the trial began. Moudy, 462 F.2d at 696. In concluding denial of the subpoena was reversible error, the Fifth Circuit noted the record "does not demonstrate that in fact the trial would have been delayed." Moudy, 462 F.2d at 698. In Edwards, the court denied the defense request on the last

29

day of trial for a short recess until the end of the lunch break to enforce several subpoenas. Edwards, 68 Wn.2d at 251-52, 254. Because the "court's schedule of trial or orderly procedure" would not have been "seriously disturbed," the Supreme Court concluded the trial court abused its discretion in denying the request for a brief recess over the noon hour. Edwards, 68 Wn.2d at 257-58.

Sufficiency of the Evidence

Ibrahim contends the evidence does not support the jury conviction of assault in the first degree of Kebede.

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Witherspoon, 180 Wn.2d at 883. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

Ibrahim claims there was no evidence Kebede was injured or "placed in fear." The amended information alleged Ibrahim and Shire committed assault in the first degree of Kebede with a firearm. The amended information alleged:

> That the defendants YUSUF HAISE SHIRE AND MOHAMED IBRAHIM in King County, Washington, on or about May 18, 2013, with intent to inflict great bodily harm, did assault Berket Kebede with a firearm and force and means likely to produce great bodily harm or death, to-wit: a handgun;

30

Contrary to RCW 9A.36.011(1)(a), and against the peace and dignity of the State of Washington.

To convict Ibrahim of assault in the first degree as charged in the amended information under RCW 9A.36.011(1)(a), the State had the burden of proving beyond a reasonable doubt that with intent to inflict great bodily harm, Ibrahim assaulted Kebede with a firearm. RCW 9A.36.011(1)(a) states, in pertinent part:

> A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
> (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death.[10]

Viewing the evidence and all reasonable inferences in the light most favorable to the State, a rational jury could find that with intent to inflict great bodily harm, Ibrahim assaulted Kebede with a firearm. The evidence established Ibrahim used a 9mm semiautomatic pistol to fire at least six shots at Williams, Barnes, and Kebede. Williams testified Shire and Ibrahim fired shots at them while they were standing "in the line of fire" next to each other. Carolyn Barnes-Arnold testified that when she saw Williams and Kebede immediately after the shooting, they were "scared" and in a "panic." Sufficient evidence supports Ibrahim's conviction for assault of Kebede in the first degree.

Sentencing

Ibrahim asserts the court erred by sentencing him to serve the assault convictions consecutively. The court imposed a low-end standard range sentence of 120 months, 93 months, and 93 months for the three assault in the first degree convictions to be served consecutively; mandatory consecutive 60-month terms of

---

[10] "Great bodily harm" means "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(c).

31

confinement for the three firearm enhancements; and a concurrent standard range sentence of 54 months for unlawful possession of firearm in the first degree.

Under RCW 9.94A.589(1)(b), when a defendant is convicted of two or more "serious violent offenses" that arise from "separate and distinct criminal conduct," the sentences must be served consecutively. State v. Cubias, 155 Wn.2d 549, 552, 120 P.3d 929 (2005). Assault in the first degree is a "serious violent offense." RCW 9.94A.030(46)(a)(v). " 'Offenses arise from separate and distinct [criminal] conduct when they involve separate victims.' " Cubias, 155 Wn.2d at 552[11] (quoting In re Pers. Restraint of Orange, 152 Wn.2d 795, 821, 100 P.3d 291 (2004)); State v. Wilson, 125 Wn.2d 212, 220, 883 P.2d 320 (1994).

Ibrahim claims the court erred by requiring him to serve the sentences consecutively because the court did not explicitly find that the three assault convictions involved separate and distinct criminal conduct. Because the State charged Ibrahim with three counts of assault in the first degree of three different victims and the jury returned a separate verdict for each count of assault in the first degree for each victim, the court did not err by imposing a consecutive sentence for the three convictions.

Statement of Additional Grounds

In his pro se statement of additional grounds, Ibrahim relies on State v. Graham, 181 Wn.2d 878, 337 P.3d 319 (2014), to argue the court abused its discretion by not considering the purposes in RCW 9.94A.010 in denying his request for an exceptional sentence below the standard range.

As a general rule, a court must sentence a defendant under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, within the standard range. Graham,

---

[11] Alteration in original.

181 Wn.2d at 882. But a standard range sentence imposed for multiple serious violent offenses must be served consecutively. RCW 9.94A.589(1)(b). "The court may impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence." RCW 9.94A.535(1). One mitigating circumstance is where "[t]he operation of the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in RCW 9.94A.010." RCW 9.94A.535(1)(g). If the imposition of a consecutive sentence is so clearly excessive under the circumstances that it provides " 'substantial and compelling reasons' " for an exceptional sentence below the standard range, the sentencing court may grant that exceptional sentence. Graham, 181 Wn.2d at 885 (quoting RCW 9.94A.535).

Here, the court considered the request to impose an exceptional sentence below the standard range under the multiple offense policy but found "no basis" to conclude the standard range sentence was clearly excessive "in light of the purpose of the sentencing laws." The court did not abuse its discretion in concluding the circumstances did not justify an exceptional sentence downward.

Ibrahim also argues the 486-month sentence constitutes cruel and unusual punishment. The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." The state constitution provides greater protection than the federal constitution. Article I, section 14 of the Washington State Constitution prohibits the infliction of "cruel punishment." A sentence violates the state constitution when it is grossly disproportionate to the crime for which it is imposed.

33

State v. Morin, 100 Wn. App. 25, 29, 995 P.2d 113 (2000). A punishment is grossly disproportionate "if the punishment is clearly arbitrary and shocking to the sense of justice." State v. Smith, 93 Wn.2d 329, 344-45, 610 P.2d 869 (1980). Because the imposition of a sentence under the SRA guidelines is not arbitrary and shocking to the sense of justice, we reject Ibrahim's argument. See State v. Farmer, 116 Wn.2d 414, 434, 805 P.2d 200 (1991).

We affirm the jury convictions and entry of the judgment and sentence.

WE CONCUR: